IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARCOS C.,[1] | ) |
| | ) |
| Plaintiff, | ) No. 17 C 9262 |
| | ) |
| v. | ) Magistrate Judge Jeffrey Cole |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, seven years ago in September of 2014. (Administrative Record (R.) 200-06). He claimed that he became disabled as of March 5, 2013, due to a right shoulder injury, back pain, and depression. (R. 200, 248). Over the next four years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) back on December 26, 2017, and the case was assigned to a district court judge. The case was fully briefed as of August 22, 2018, over four years ago. [Dkt. ##10, 13, 17]. Nothing happened for three and a half years, until March 4, 2022, when the district court judge ordered the parties to file a status report. [Dkt. # 26].[2] The

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

[2] The lengthy period this case has gone without activity before the parties consented to my jurisdiction means it arrived on my docket as already reportable under the Civil Justice Reform Act, 28 U.S.C. § 476(a)(3). Under the Federal Rules of Civil Procedure, the Court has a duty "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. "[T]he public has an interest
**(continued...)**

parties ultimately failed to comply and the judge issued another Order. [Dkt. #27]. On July 22, 2022, the parties finally consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). [Dkt. ##28, 29]. It is the ALJ's May 3, 2017 decision (R. 14-38) that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### A.

Plaintiff was born on October 31, 1976, making him 37 years old when he claims he became unable to work. (R. 200). He worked steadily for about 20 years prior to that, from 1993 through 2013. (R. 222-23). For much of that time, he worked as an automotive technician at a used car dealership. (R. 240). This was heavy work; he was on his feet all day and had to lift up to 100 pounds and carry up to 50 pounds. (R. 241).

Plaintiff's problems stem from a shoulder injury he suffered doing that heavy work. On March 5, 2013, plaintiff underwent his fourth and last shoulder surgery, a labral debridement and subacromial decompression. (R. 388-92). By March 29, 2013, he was progressing well with

---

²(...continued)
in the prompt disposition of civil litigation, an interest that has been enacted into positive law via the Civil Justice Reform Act of 1990." *Chagolla v. City of Chicago*, 529 F.Supp.2d 941, 946-47 (N.D.Ill. 2008). One way the CJRA works toward the goal of prompt resolution is through required public reporting of cases that have been pending before a district court for over three years. *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 897 (N.D. Ill. 2000); *Riviera Fin. v. Trucking Servs., Inc.*, 904 F. Supp. 837, 840 (N.D. Ill. 1995).

Moreover, a Social Security case becomes reportable as "overdue" about ten months after the Commissioner files the certified transcript. The standard briefing schedule, N.D.Ill.L.R. 16.4 takes up four of those months. Parties can help out, of course, by meeting briefing schedules without multiple extensions. Additionally, from time to time, with large dockets, judges and magistrate judges can lose track of pending cases and motions. The Local Rules provide a mechanism by which the parties can remind a judicial officer of a pending matter, *see* N.D.Ill.L.R. 78.5, although it is understandable that parties might not choose to make use of it.

physical therapy and taking Norco as needed for pain. He was having some mild pain with overhead motion, 5/10 at worst. (R. 413). A month later, plaintiff had pain with forward elevation at 130 degrees and external rotation at 20 degrees. (R. 412). On May 15, 2013, plaintiff had clicking with forward elevation, and Dr. Rawal kept plaintiff off work and recommended aggressive physical therapies. (R. 410).

By June 4, 2013, plaintiff had improved to forward elevation of 160 degrees on the right and 165 degrees on the left. Strength was 5/5 in all muscle groups. There was still crepitus in the shoulder. (R. 409). A month later, shoulder range of motion equal bilaterally and strength was 5/5; crepitus continued. (R. 408). On July 30, 2013, examination was essentially the same. (R. 407).

On August 6, 2013, plaintiff complained that physical therapy was adversely affecting his lower back. There was mild paraspinal tenderness and mild pain with flexion and extension. Straight leg raising was negative, and strength, reflexes, and sensation were all normal. (R. 406). On September 30, 2013, plaintiff continued to have neck and shoulder pain; exam was essentially the same and lumbar x-rays were normal. (R. 405). Plaintiff still had mild tenderness on October 28, 2013, lumbar range of motion – flexion, extension, and rotation – was full; reflexes, strength, and sensation were normal. Right shoulder was grossly unchanged and the painful popping and clicking continued. (R. 404).

On November 7, 2013, a lumbar spine MRI showed no abnormality, normal vertebral height, no subluxation, normal disc spacing, no herniation, no disc disease or stenosis. There was a slight loss of lordosis. (R. 403, 433). On December 16, 2013, plaintiff saw Dr. Rawal with complaints of lumbar strain. Exam revealed some mild diffuse low back tenderness. Straight leg raising was negative bilaterally, and strength, sensation, and reflexes were all normal. (R. 401).

On December 19, 2013, plaintiff underwent a thorough physical capacity evaluation at the request of Dr. Ashish Rawal, plaintiff's surgeon. (R. 356-84). Grip strength was less than normal, but there were no signs of physical discomfort during grip strength testing (R. 367, 375). Range of motion was within functional limits throughout – shoulders, elbows, wrists, hips, knees, ankles, lumbar flexion – with the exception of lumbar extension. (R. 371-73). Straight leg raising was negative supine and only slightly limited at 80 degrees sitting. (R. 374). Plaintiff's dexterity – turning and placing objects – was poor due to back pain when bending and stooping. (R. 375-76). Overall, the results of testing suggested plaintiff might benefit from an occupation that required up to 25 pounds of lifting, no higher than shoulder height, on an occasional basis. The examiner thought plaintiff might benefit from positional changes on an occasional basis. (R. 357, 384). Plaintiff had limited tolerance for low level and above shoulder level tasks. (R. 384). On January 3, 2014, plaintiff told Dr. Rawal that the evaluation hurt his back, but examination was unchanged from the normal exam before the evaluation. (R. 400).

On January 13, 2014, Dr. Anthony Romeo examined plaintiff for workers' compensation. He noted surgery was well-healed, and range of motion was full throughout flexion, abduction, extension, and rotation. Rotator cuff strength was 5/5. There was some tenderness. Dr. Romeo noted permanent work restrictions of no lifting over 20 pounds and no work above shoulder level. (R. 451).

On December 22, 2014, Dr. Kohlenberg completed a psychiatric report and a neurological report regarding plaintiff's back impairment. He had treated plaintiff once or twice a month since February. Diagnoses were depression, back pain, torn labrum. (R. 498). Plaintiff's mood was appropriate, although sometimes tearful when talking about his work situation. Thought process was

normal, recent and remote memory were normal, judgment was normal, abstract thinking was normal, calculation was normal. (R. 499-500). Plaintiff had no limitations in terms of sustaining and completing tasks, understanding or carrying out instructions, responding appropriately to supervisors and coworkers. (R. 500).

Neurologically, mental status was normal in all aspects. (R. 502). Muscle strength was 5/5 throughout upper and lower extremities. (R. 503). Reflexes were normal throughout. Gait was completely normal in all aspects. (R. 505). Manipulation – opening doors, picking up coins, working buttons and zippers, etc. – was normal. (R. 506).

Plaintiff had a consultative physical examination with Dr. Carolyn Hildreth on January 8, 2015, in connection with his application for benefits. Plaintiff indicated his major problem continued to be his shoulder. (R. 539). Upon examination, Dr. Hildreth noted that gait was normal and straight leg raising was negative. Range of motion in the lumbar spine was limited to 60 degrees flexion, 10 degrees extension, and 20 degrees lateral bending. The doctor noted crepitus in the right shoulder when moving plaintiff's right arm through range of motion. She also observed that plaintiff was "exquisitely tender over the anterior aspect of the right shoulder." There was increased sensitivity to pinprick in the dermatomes of the right arm. (R. 541).

Dr. Kohlenberg filled out a Mental Disorder Questionnaire on March 23, 2015. He reported that plaintiff had a normal level of functioning as far as daily activities (R. 603), and a normal level of social functioning, although his marriage was stressed. (R. 604). Plaintiff's concentration and task completion were normal. As for adapting to work situations, the doctor reported that plaintiff lost his job because of his physical injury and had been unable to get a desk job with his former employer. (R. 604).

5

On July 15, 2015, plaintiff saw Dr. Min Kim with complaints of low back pain. Plaintiff had finished physical therapy the preceding month. (R. 608). Reflexes and sensation were normal. Strength was 5/5 throughout except 4/5 in the left hip due to pain. Lumbar and hip range of motion were limited. Gait was varied; "[s]ometimes normal. Sometimes left hip hiking and stiff legged knee extension." (R. 610). Plaintiff had a facet joint injection on August 7, 2015. (R. 614). On September 22, 2015, plaintiff reported no change in his pain after the injection. He rated his low back pain at 5/10 and reported left heel and forefoot pain. (R. 616). Sensory exam was normal. Strength was 5/5 throughout with some pulling upon left knee extension. There was decreased range of motion in the lumbar spine. Gait was normal. (R. 617). On November 21, 2015, plaintiff reported a little bit of back pain, at 2/10. He felt like he was tripping with his left leg. (R. 621). Sensation was normal and strength was normal in the lower extremities. Range of motion was decreased in the lumbar spine. Gait was normal. (R. 622).

On July 12, 2016, plaintiff said his pain was 4/10, but went up to 7/10 if he walked 3 blocks. He had pain after sitting a long time as well, and getting up to stand. (R. 625). Sensory exam was normal and strength was 5/5 throughout. Plaintiff had a near full range of motion in the lumbar spine. Gait was normal. (R. 626). Plaintiff had another injection on August 7, 2015. (R. 633-636). At that time, lumbar x-rays were normal, including range of flexion and extension. (R. 637). On August 17, 2016, Sensation and strength were, again, normal. There was decreased lumbar range of motion but gait was, again, normal. (R. 630).

Plaintiff also had therapy sessions to cope with his depression. The notes from those are generally normal and reveal no significant limitations due to plaintiff's mental impairment:

> April 16, 2015 – Plaintiff reported improved mood and anxiety. Examination: mood depressed, affect appropriate, memory intact, thought process appropriate, insight

6

good, judgment good. (R. 653).

May 5, 2015 – plaintiff feeling anxious but much better overall; denied sad mood. Examination: mood euthymic, affect appropriate, memory intact, thought process thought blocking, insight good, judgment good. (R. 655).

July 6, 2015–plaintiff thought therapy and medication was helping overall. Examination: mood euthymic, affect appropriate, memory intact, thought process appropriate, insight good, judgment good. (R. 657).

September 14, 2015– Plaintiff reported racing thoughts and difficulty with concentration due to stress with work situation. Examination: mood euthymic, affect appropriate, memory intact, thought process appropriate, insight good, judgment good. (R. 659).

November 2, 2015– Plaintiff denied any psychiatric symptoms. Examination: mood euthymic, affect appropriate, memory/cognition immediate, thought process thought blocking improvement, insight good, judgment good. (R. 661).

January 11, 2016– Plaintiff reported frustration and difficulty with concentration. Examination: mood euthymic, affect appropriate, memory/cognition recent remote, thought process thought blocking baseline, insight good, judgment good. (R. 663).

January 25, 2016– Plaintiff said he was doing "so so", and was depressed over his finances and lawsuit. (R. 665).

March 14, 2016– Plaintiff reported trouble sleeping and said he was irritable due to pain, which he rated as 6/10. Examination: mood irritable, affect appropriate, memory/cognition intact, thought process, insight good, judgment good. (R. 667).

June 27, 2016– Plaintiff reported improve sleep – six to eight hours uninterrupted each night – denied depression, but said his mood went from anxious to angry. Examination: mood irritable, affect appropriate, memory/cognition intact, thought process appropriate, insight fair, judgment good. (R. 669).

August 22, 2016– Plaintiff was in a bright mood, said new muscle relaxer was helping. Examination: mood euthymic, affect appropriate, insight fair, judgment good. (R. 671).

October 31, 2016– Plaintiff said his medication was still working and he was sleeping six to seven hours a night. He felt hopeful for the future. Examination: mood euthymic, affect appropriate, memory/cognition intact, thought process appropriate, insight good, judgment good. (R. 673).

**B.**

After an administrative hearing at which plaintiff, represented by counsel testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: right shoulder injury, status post four surgeries, spine disorder, obesity and major depressive disorder. (R. 22). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings that applied to musculoskeletal disorders (1.02, 1.04), and mental impairments (12.04). (R. 22-25). With regard to plaintiff's major depressive disorder, the ALJ found that plaintiff had mild limitations in understanding, remembering, or applying information; mild or moderate limitations in interacting with others – the ALJ wasn't clear; moderate difficulties concentrating, persisting, or maintaining pace; and no limitations in the area of adapting or managing oneself. (R. 24-25).

The ALJ then determined that plaintiff could perform light work with the following additional limitations:

> no climbing of ladders, ropes or scaffolds and no more than frequent pushing or pulling with the right upper extremity. [Plaintiff] is limited to occasional stooping, crouching and crawling and frequent kneeling. [Plaintiff] is limited to no more than frequent reaching with the right upper extremity in any direction. The [plaintiff] should not be required to have more than brief and superficial contact with the public as a part of the job.

(R. 25). The ALJ then summarized the plaintiff's allegations. She noted that plaintiff said he could lift about 50 pounds, but constant movement such as pulling and pushing caused problems. The ALJ said that the plaintiff stated he had difficulty brushing his teeth because the back and forth motion irritated his shoulder, that pain in his left leg and heel was eight or nine out of ten, and that

8

that he treated by reclining three or four times a day and with cold packs. The ALJ further noted that the plaintiff claimed he could only walk a couple of blocks and could stand 30 to 60 minutes at a time, that he also felt pain while sitting, and could drive for only twenty minutes. (R. 26).

The ALJ also related plaintiff's claims of mental limitations: he had no hobbies, he could prepare sandwiches, he did not help his children with homework but attended parent/teacher conferences, he lost patience and became irritated easily, he had issues with concentration and sleeping, and no longer participated in social activities. (R. 26). The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 26).[3]

The ALJ then discussed the medical record. The ALJ noted that plaintiff had had four right shoulder surgeries, and that his pain was reduced by 50% with physical therapy. Although he suffered some painful "popping", his strength improved and was able to lift 50 pounds from floor to waste, 25 pounds from waste to shoulder, and 20 pounds overhead at a functional capacity evaluation. The ALJ noted that plaintiff developed back pain during physical therapy, but added that an MRI revealed no significant disk herniation or degenerative disc disease or spinal stenosis, and that straight leg raising was negative and strength was 5/5. Exams showed ambulation and gait to be normal in December 2014 and January 2015, but normal or sometimes antalgic in later 2015.

---

[3] Oddly, when addressing plaintiff's symptoms, the ALJ referred to plaintiff's "*alleged* severe physical impairments (right shoulder injury and spinal disorder) . . . (emphasis added)" (R. 26), despite the fact that the ALJ had just found that these impairments were medically documented and, indeed, severe. (R. 22).

The ALJ noted treatment with a facet injection in September 2015 (R. 27-28). As for plaintiff's depression, the ALJ noted that the medical records and history of medication showed plaintiff's mental issues were "not so severe that they interfere with his ability to perform at least simple and routine tasks." (R. 29).

The ALJ noted that plaintiff was independent with his activities of daily living, drove a car, shopped for groceries, and that the consultative examiner diagnosed only a mild depressive disorder. The ALJ acknowledged that the record documented some crying episodes and bad days, but that it also showed several normal examinations and that plaintiff's depression was stable or controlled with medications. The ALJ gave little weight to a GAF score of 50, noting that the Commissioner declined to endorse these scores for use in disability determinations and that they were no more than snapshots of functioning at the time. The ALJ added that therapy records showed improved mood and normal findings. (R. 29).

As for medical opinions, the ALJ afforded some weight to the opinion from the state agency physician at the reconsideration level. The ALJ noted that the reviewing physicians felt that plaintiff could perform light work with additional restrictions against climbing ladders, ropes or scaffolds, and no more than occasional stooping, crouching or crawling and frequent kneeling. As for the opinion of the state agency reviewing psychologist that plaintiff had no severe mental impairment, the ALJ afforded it little weight because later evidence showed greater social isolation and irritability. (R. 30). The ALJ assigned "great weight" to Dr. Kohlenberg's diagnosis and assessments of plaintiff's mental functioning, explaining that they were by his treatment notes. (R. 30). Earlier in her opinion, the ALJ allowed "some weight" to Dr. Romeo's permanent work restrictions of light duty and not work above shoulder level, explaining that Dr. Romeo issue these

restrictions less than twelve months after surgery while the plaintiff was showing improvement. (R.27).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could not perform his past medium to heavy work as an automobile mechanic because the demands exceeded his residual functional capacity. (R. 31). But, there were other jobs at the light exertional level that plaintiff could perform, for example: cleaner/housekeeper (Dictionary of Occupational Titles #323.687-104; 200,000 jobs); or mail clerk (Dictionary of Occupational Title s#209.687-026; 60,000 jobs). (R. 32). Accordingly, the ALJ found the plaintiff not disabled and not entitled to benefits under the Act. (R. 33).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

11

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might

see a trickle of a creek they can hop across with barely a splash.[4] But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Given the record and the ALJ's decision, the ALJ has not done enough to allow the court to do that here.

## II.

The plaintiff has a host of problems with the ALJ's opinion. First, the plaintiff claims that the ALJ's physical RFC assessment falls far short of accommodating plaintiff's physical restrictions. Second, the plaintiff contends that the ALJ's assessment of the plaintiff's restrictions due to his depression all but ignored the limitations arising out of plaintiff's severe mental impairments. Third, the plaintiff argues that the ALJ's determination that the objective findings fail to provide strong support for plaintiff's allegations of disabling limitations was premised upon impermissible "cherry-picking." Fourth, the plaintiff claims that the ALJ failed to properly weigh the opinion's various treating and non-treating medical professionals. Finally, the plaintiff contends that the ALJ's finding that plaintiff can perform other available work is premised upon a flawed evaluation of vocational testimony. Each of these arguments has some sub-arguments, so the plaintiff's brief

---

[4] By way of example, in the Seventh Circuit's recent ruling in *Jarnutowski v. Kijakazi*, No. 21-2130, 2022 WL 4126293 (7th Cir. Sept. 12, 2022), two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

presents a bit of a challenge to get through and perhaps accounts for some of the delay before the previous judge once briefing was completed. *Cf. Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011). As a remand is required here, the court will confine its focus to the first couple of topics.

**A.**

As already noted, this is a "logical bridge" case. The idea behind the "logical bridge" requirement is to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Grotts v. Kijakazi*, 27 F.4th 1273, 1277 (7th Cir. 2022); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015)"The ALJ . . . must adequately articulate her analysis so that we can follow her reasoning."). The ALJ's decision in this case was a little murky in a couple of key areas.

First, there is the issue of plaintiff's right shoulder. It's really what this case is about. The plaintiff worked as a mechanic for two decades until he tore his shoulder doing some heavy lifting. Suddenly, he could no longer do the only job he ever had. He hoped to get a lighter duty position with the dealership, but he was denied. He has a high school education and English is his second language. So, the question for plaintiff was what, if anything, was next? It's no wonder he became anxious and depressed. One impairment fed the other.

The ALJ found that plaintiff's injured shoulder was a severe impairment and clearly, after four surgeries, the plaintiff does have some limitations in his shoulder. Even after his fourth and final – hopefully – surgery, he continued to have painful crepitus in his shoulder for at least two years. (R. 404, 408, 409, 410, 541). The ALJ acknowledged that. (R. 28). Yet, the ALJ found that the plaintiff could perform *frequent* reaching with that arm in *all* directions. That's reaching in all

14

directions – including over shoulder level – from one third to two thirds of every workday. *See* SSR 83-10, 1983 WL 31251, at *6 (1983)("'Frequent' means occurring from one-third to two-thirds of the time."). It's not clear where the ALJ got that from. She said her finding was "consistent with Dr. Kohlenberg's statement at Exhibit 3F page 8" (R. 28), but that exhibit is from Dr. Romeo, not Dr. Kohlenberg. (R. 449).

Dr. Romeo restricted plaintiff to "light duty" with the additional restriction of no lifting "greater than shoulder height on an occasional basis" and "no work above shoulder level." (R. 451).[5] So that can't be the support for the ALJ's finding that plaintiff retained the ability to reach in all directions for – approximately – two to five hours a day. There's certainly no logical bridge there.

The ALJ did address Dr. Romeo's opinion and said she said she afforded it, a little vaguely, "some weight." (R. 27). She explained that Dr. Romeo issued those restrictions within 12 months of surgery when plaintiff's shoulder was still "showing improvement." (R. 27). But, again, it's hard to follow the ALJ's reasoning. As already noted, the painful crepitus in plaintiff's shoulder continued for months after surgery, into 2015. (R. 28, 404, 408, 409, 410, 541). And, as already noted, the ALJ seemed to accept that. More importantly, Dr. Romeo was crystal clear that his restrictions were permanent and plaintiff had reached maximum medical improvement. (R. 449, 451). His shoulder was not, as the ALJ claimed, continuing to show improvement. And the ALJ points to no other evidence to show that it was. (R. 27). *See Moon v. Colvin*, 763 F.3d 718, 721 (7th

---

[5] The ALJ even hedged her bets, perhaps unconvinced herself, and said that "adding occasional overhead reaching, the vocational expert was able to identify other jobs (refer to Hearing Record)." (R. 29). Perhaps, but again, the evidence the ALJ purportedly relied on said *no* work above shoulder level. And, references to "occasional" in the evidence included lifting (R. 357, 384, 451), which would seem to rule out light work. *See* 20 C.F.R. § 404.1567.

15

Cir. 2014)("This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision.").

If the ALJ really did mean that one of Dr. Kohlenberg's statements was support for her finding that plaintiff could perform frequent reaching every day, and simply mistakenly cited the wrong exhibit, the bridge is still out. Dr. Kohlenberg filled out a neurological report, but that was in regard to plaintiff's back impairment. (R. 502). The doctor didn't address plaintiff's shoulder and didn't say anything about shoulder range of motion or reaching. (R. 503, 506). So, again, there's no way for the court to trace the path of reasoning from Dr. Kohlenberg's report to the plaintiff being able to reach in all directions for up to five or six hours a day despite his painfully popping shoulder.

An ALJ's residual functional capacity finding has to include all the limitations supported by the medical record." *Reynolds*, 25 F.4th at 473; *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). And, an ALJ has to explain how she got from the medical record to her residual functional capacity finding. *Reynolds*, 25 F.4th at 473; *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). Perhaps there is evidence in the record here to support the ALJ's finding, but the evidence the ALJ cited does not, and the explanation she provided is inadequate.

**B.**

While this case has to be remanded given the ALJ's inadequate explanation of her residual functional capacity finding, it is worthwhile to address a similar problem with the ALJ's mental residual capacity finding. This might be a product of scrivener's errors, but even so, the ALJ's findings regarding the plaintiff's limitations on concentration, persistence, and pace are sufficiently

confusing to leave a reviewing court wondering just what she meant. *Cf. Herrmann v. Colvin*, 772 F.3d 1110, 1112 (7th Cir. 2014)("[A scrivener's error] is possible, but we can't assume it to be true on the basis of the lawyer's speculation."). So, again, there is a "logical bridge" problem.

Initially, the ALJ found that "[w]ith regard to concentrating, persisting, or maintaining pace, the [plaintiff] has a mild limitations." (R. 24). But, a few sentences later, the ALJ said that "[o]verall, the weight of the evidence is consistent with the [plaintiff] having 'moderate' difficulties maintaining concentration, persistence, or pace, but does not support a 'marked' level of restriction in this domain of functioning as it is defined in the regulations." (R. 24-25). So, it's difficult to see which side of the fence the ALJ landed on. The plaintiff interpreted it as a "moderate" restriction in his brief [Dkt. #7, at 11], and the Commissioner's brief did not indicate any disagreement. [Dkt. #15]. Still later in her opinion, the ALJ said the plaintiff "medical issues are not so severe that they interfere with his ability to perform at least simple and routine tasks." (R. 29). But, the ALJ included no limitations regarding concentration, persistence, or pace in her residual functional capacity finding, and no limitation to simple, routine work. (R. 25).

While the Seventh Circuit seems to have relaxed its stance on whether a limitation to simple work can adequately account for a moderate limitation in concentration, persistence, and pace, Compare *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)("In most cases, however, employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace.") with *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)("So a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace."), if there is a moderate limitation, the ALJ must still account for it somehow.

17

*Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

Again, these may have been scrivener's errors, and to call them out might be said to border on nitpicking, which the court does not wish to do. *See, e.g, Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). But when they are added to the issues with the physical residual functional capacity finding, it becomes even more difficult to follow the path of the ALJ's reasoning. *See Lothridge*, 984 F.3d at 1234 ("To put it another way, an internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge between the evidence and the result."). At a certain point, when the reviewing court has to say, more than once, "the ALJ probably meant this" or the "ALJ must have meant that", the court is no longer reviewing the ALJ's reasoning but supplying it, and that's something the Commissioner's lawyers aren't even allowed to do. *Poole*, 28 F.4th at 796; *Lothridge*, 984 F.3d at 1234. Remand will provide an opportunity to pick a lane, moderate or mild, and address whatever effect that might have on residual functional capacity.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgement [Dkt. #6] is granted, the Commissioner's motion for summary judgment [Dkt. #14] is denied, and this case is remanded to the Commissioner.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/29/22